| | | |
|---|---|---|
| ANDREW TYLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-01478-TWP-DLP |
| | ) | |
| JP OPERATIONS, LLC | ) | |
| d/b/a JACK'S PIZZA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Before the Court are the parties' cross-motions for partial summary judgment. Plaintiff Andrew Tyler, ("Tyler"), initiated this action against his former employer, Defendant JP Operations, LLC d/b/a Jack's Pizza, Inc., ("Jack's"), for unpaid wages and the failure to pay minimum wage for hours worked while working as a pizza delivery driver. On October 24, 2017, Jack's filed its Motion for Partial Summary Judgment (Filing No. 62), and on December 13, 2017, Tyler filed his Cross-Motion for Partial Summary Judgment (Filing No. 70). For the following reasons, the Court **grants in part** and **denies in part** Jack's Motion for Partial Summary Judgment, and **grants in part** and **denies in part** Tyler's Cross-Motion for Partial Summary Judgment.

## I. BACKGROUND

This case arises out of a wage dispute involving Tyler's time working for Jack's as a part-time pizza delivery driver. JP Operations, LLC operates Jack's, a chain of pizza stores in central Indiana. (Filing No. 64-3.) Tyler worked primarily at the store located at 8025 Pendleton Pike, Lawrence, Indiana 46226 (the "Pendleton Pike store") from approximately August 6 to December 23, 2013, and was subsequently transferred to the store located at 5650 East 86th Street, Indianapolis, Indiana 46240 (the "Castleton store"), where he worked from January 9 to May 10,

2014.  ([Filing No. 64-1 at 21](#); [Filing No. 64-3 at 1](#).)[1]  Both stores were open 4:00 p.m. until 11:00 p.m., Sunday through Thursday. On Friday and Saturday, the business hours for the Pendleton Pike store was 4:00 p.m. until 1:00 a.m., and the Castleton store hours were from 4:00 p.m. until 12:00 a.m. ([Filing No. 64-3 at 2](#)).  The Pendleton Pike store used a computer-based point-of-sale system ("POS") to enter customer order details including the delivery address and assigned pizza delivery driver.  ([Filing No. 64-14 at 31](#).)  Because the Castleton store did not have a POS system, all orders were recorded on paper.  *Id.* at 23.

Tyler's base rate of pay was $7.25 per hour.  ([Filing No. 64-3 at 3](#).)  Tyler's supervisor, Ryan Johnson ("Johnson"), recorded Tyler's clock-in and clock-out times while Tyler was employed at the Pendleton Pike store.  ([Filing No. 64-1 at 38](#).)  For several shifts, Tyler initialed completed timesheets, prepared by Johnson, verifying that the timesheet was accurate.  ([Filing No. 64-1 at 82-84](#).)  Tyler did not keep track of his own log of hours.  *Id.* at 24.  The Castleton store had actual timesheets that Tyler initialed each and every shift.[2]  *Id.* at 32.  Tyler testified that he closed the Pendleton Pike store almost every shift he worked, which caused him and Johnson (closing manager) to leave the store close to midnight or shortly thereafter at the end of Tyler's shifts.  *Id.* at 35.  The closing duties included: washing dishes, taking out the trash, sweeping and mopping the floor, and folding boxes if needed.  *Id.* at 45.  Tyler testified that it would take an hour or more to perform all of the closing tasks.  *Id.*  A sample of Tyler's clock out times for certain dates where he alleges that he was not paid for all of his hours is included below:

    a.      Tuesday        8-6-13        11:30 p.m.

    b.      Tuesday        8-27-13     11:35 p.m.

---

[1] The majority of the wage disputes in this case surround the Pendleton Pike store.

[2] Tyler does not allege any unpaid hours for the time period that he worked at the Castleton store.  ([Filing No. 64-1 at 25](#).)

| c. | Monday | 9-9-13 | 11:10 p.m. |
| d. | Monday | 9-16-13 | 11:35 p.m. |
| e. | Wednesday | 9-18-13 | 11:30 p.m. |
| f. | Monday | 9-23-13 | 11:25 p.m. |
| g. | Wednesday | 10-2-13 | 11:10 p.m. |
| h. | Monday | 10-7-13 | 11:30 p.m. |
| i. | Monday | 10-14-13 | 11:20 p.m. |
| j. | Wednesday | 10-16-13 | 11:10 p.m. |
| k. | Wednesday | 10-23-13 | 11:10 p.m. |
| l. | Monday | 10-28-13 | 11:20 p.m. |
| m. | Wednesday | 10-30-13 | 11:15 p.m. |
| n. | Tuesday | 11-5-13 | 11:00 p.m. |

(Filing No. 71 at 4-5).  Most of Tyler's closing shifts were worked with Johnson.  On such days Johnson's timesheets reflect the same clock-out times as Tyler's.  (Filing No. 64-3 at 3.)  Tyler's timesheets for both the Pendleton Pike store and Castleton store reflect that 696.16 hours were recorded and paid to him.  *Id.*

In addition to Tyler's base hourly rate, he also received reimbursements for driving expenses ("Driver's Fees") which was calculated based on the following formula:  "for each order a driver delivered, the driver received $1.25 + 3% of the order total (pre-tax)".  *Id.* at 5.  Jack's maintained a policy that it would not deliver an order if the order total was less than $15.00, thus based on the calculation ($1.25 + [0.03 * $15.00]), a driver would receive at least $1.70 on each order.  *Id.*  The store manager on shift calculated the Driver's Fee reimbursements at the end of each shift.  The Pendleton Pike store manager used the POS system, which printed out an account

3

report that showed the total order amount for each driver, to calculate and pay Driver's Fees. *Id.* at 42. Because the Castleton store did not have a POS system, the store manager used a paper form called a Driver Checkout sheet to calculate Driver's Fees. *Id.* at 61. As an example, on August 21, 2013, Tyler delivered three orders totaling $103.23, and based on the Driver's Fee calculation he received $6.59 in Driver's Fees. (Filing No. 64-3 at 5.) Tyler earned a total of $1,520.97 in Driver's Fees during his employment at both store locations. The parties disagree on the total mileage driven by Tyler as a delivery driver, however the disagreement is *de minimis* as it is a seventy mile difference. Tyler's calculation for total mileage, for the Pendleton Pike store, is 2,416.4 miles derived from Tyler's counsel using Mapquest.com and customer's addresses round-trip miles, while Jack's figure is approximately 2,346.40 derived from the POS system. (Filing No. 70-2 at 1; Filing No. 64-3 at 4.) It is undisputed that Tyler was paid $866.17 total in Driver's Fees from the Pendleton Pike store; however, based on the different total mileage calculations, Tyler alleges Jack's mileage rate actually paid to him equals $0.36 per mile, while Jack's calculation equals $0.37 per mile. (*See* Filing No. 71 at 6; Filing No. 63 at 6.)[3]

## II.  LEGAL STANDARD

Summary judgment is only appropriate by the terms of Rule 56 where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of

---

[3] As will be explained in Section III(D), Tyler disputes the mileage rate that should have been used under Department of Labor ("DOL") regulations, as well as an expert report.

taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

A court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id.*

### III. <u>DISCUSSION</u>

#### A. <u>Tyler's Declaration</u>

Tyler designates his Affidavit as part of his Response in Opposition to Summary Judgment which contains a paragraph stating: "I made a mistake in my deposition testimony when I testified that I drove my car, the 2002 Mercury Marquis, for my other job at Central Insulation. *See* (Deposition p. 23:4-12). I drove my truck, the 2001 Mazda Tribute, for both my jobs at Central Insulation and Jack's." (<u>Filing No. 70-1 at 1</u>). Jack's requests that this Court disregard this portion of the Affidavit, as it improperly contradicts Tyler's prior deposition testimony that he drove

different cars for both jobs. (*See* [Filing No. 64-1 at 22-23](#); [Filing No. 74 at 6](#).) The Court agrees on this point. "It is a well-settled rule of this Court that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition." *Piscione v. Ernst & Young, L.L.P.,* 171 F.3d 527, 532 (7th Cir. 1999) (citations omitted). Because Tyler's expert report relies on a vehicle expense calculation based on Tyler driving the same car to both jobs, Jack's also contends that this proves that the expert report is unreliable.[4] ([Filing No. 74 at 9](#).) Tyler responds that the Affidavit was submitted to clarify the mistaken testimony and the relevant vehicle (or vehicles) used for both jobs goes to the calculation of cost per mile in arriving at a figure, for the expert report calculation, rather than on an issue of material fact. ([Filing No. 80 at 7](#).) ("If the expert report was given false information, then this would greatly increase the cost per mile for Mr. Tyler to deliver pizza for Jack's and the potential liability of Jack's.") Thus, Tyler contends that the clarification is not an attempt to manufacture a conflict (or create a disputed issue of material fact) and Jack's contention that the testimony should be struck is unfounded.

The Court will disregard Tyler's Affidavit regarding Tyler driving different vehicles to his two jobs. Tyler does not allege that he was confused or tricked by opposing counsel when asked which vehicle he drove to either job during the initial deposition. However, the Court will not find Tyler's expert report unreliable solely on the basis of this. In any event, Tyler alleges that the expert report was based on the correct information.[5] Moreover, even if the expert report relied on a faulty calculation, Tyler has also proposed the Internal Revenue Service mileage rate as the rate that he should have been reimbursed at.

---

[4] Tyler's expert report will be addressed in Section III (B).

B.  **Tyler's Expert Report**

Tyler's expert report was prepared by CJ&E Associates, LLC, a certified public accounting ("CPA") firm.  Jack's objects to the use of Tyler's Expert Report on the bases that it was untimely disclosed and is inadmissible due to unreliability.  (Filing No. 74 at 4.)  The Court will address each contention in turn.

Jack's contends that Tyler's expert report was not served at least 90 days prior to the dispositive motion deadline.  (Filing No. 74 at 2.)  Tyler responds that the reason that the expert report could not be served within the 90 day timeframe is due to Jack's failure to timely produce all records from its POS system which is relevant to Tyler's minimum wage claim.  (Filing No. 80 at 3.)  On July 21, 2017, Jack's served the documents relating to Tyler's delivery locations from the POS system at the Pendleton Pike store.  (Filing No. 80-1 at 2.)  Tyler persuasively argues that based upon receiving the delivery locations from the POS data, he could now engage an expert to calculate his costs per mile for making deliveries armed with the POS data.  (Filing No. 80 at 4.) In any event, on August 16, 2017, Tyler filed a Motion to Extend Expert Report Deadline to which Jack's filed a brief in opposition.  (Filing No. 49; Filing No. 50.)  Magistrate Judge Matthew Brookman granted the extension.  Contained in Tyler's Motion to Extend Expert Report Deadline, Tyler notified Jack's that he intended to use an expert in this matter to calculate his vehicle cost per mile driven.  (*See* Filing No. 49 at 1.)  Tyler contends that his Motion to Extend Expert Report Deadline, including the notice that he intended to use an expert, occurred within the first 26 days after receiving the POS documentation from Jack's, a reasonable amount of time.  (Filing No. 80 at 4.)

Because the timing of Jack's disclosures affected the relevant information that Tyler needed to hire an expert for the underlying calculations and Tyler's extensions were granted, the

Court declines to strike the expert report on the basis of timeliness. A party must make an expert disclosure at the times and in the sequence that the court orders. Fed. R. Civ. P. 26 (a)(2)(D). "Absent a stipulation or a court order, the disclosures must be made at least 90 days before the date set for trial or for the case to be ready for trial."

"Whether to admit expert testimony rests within the discretion of the district court." *Marshall v. Town of Merrillville,* 228 F. Supp. 3d 853, 869 (N.D. Ind. 2017) (citing *Gen. Elec. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). The Court now turns to admissibility of the expert report. Federal Rule of Evidence 702 provides that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), and Rule 702, courts are charged with ensuring that expert testimony admitted into evidence is both reliable and relevant. In *Daubert*, the United States Supreme Court articulated four factors to be used when assessing the reliability of expert testimony: (1) whether the theory or technique employed by the expert in formulating his expert opinion can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether standards control operation of the technique; and (4) whether the theory or technique is generally accepted within the relevant community. 509 U.S. at 593–94. However, these *Daubert* factors are not a definitive or exhaustive checklist. Instead, they must be employed flexibly "to account for the various types of potentially appropriate expert testimony." *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) (citation omitted). Thus, in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

150 (1999). The Seventh Circuit has set forth a three-step analysis in applying the *Daubert* standard: "(1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand evidence or to determine a fact in issue." *Redd v. Ward*, No. 3:12-CV-00070-RLY-WGH, 2014 WL 12755052, at *1 (S.D. Ind. Aug. 1, 2014) (citing *Ervin v. Johnson & Johnson, Inc.* 492 F.3d 901, 904 (7th Cir. 2007). The proffering party of the expert must show these factors by a preponderance of evidence. *Id.*

As noted previously, Campion J. Ellis ("Ellis"), CPA, is Tyler's expert. He is the sole partner of CJ&E Associates, a full-service tax, accounting, and consulting firm. ([Filing No. 70-2 at 29](#).) He has over 23 years' experience handling tax preparation (personal and business), estate tax and trust return preparation, financial accounting reporting, education planning and estate planning assistance, tax planning, various calculations for divorce situations, as well as various consulting services to small business owners and management. *Id.* Jack's does not attack the qualifications of Ellis. Accordingly, based on Ellis's extensive accounting experience, the Court finds him qualified to serve as an expert in this case.

Jack's challenges Ellis's methodology in calculating Tyler's actual vehicle cost per mile ($0.419 per mile at Pendleton Pike store and $.0366 per mile at the Castleton store) ([Filing No. 74 at 5](#)). Specifically, Jack's contends that the expert report is incomplete as the report fails to include "testimony" or any "time logs" in arriving to the estimations regarding business and personal miles use of Tyler's vehicle. *Id.* Tyler responds that the calculation and methodology is not unclear. Tyler explains the calculation:

> One can simply use a calculator to follow along. The "Costs" are obviously added up. *See* (Docket #70-2 pp. 32, 34). The "Total Miles Driven" takes all of the miles

driven by Mr. Tyler in the vehicle for different reasons and adds them up. *See id.*
The "Total Gallons" is calculated by dividing the "Total Miles Driven" by 20 miles
per gallon. *See id.* "Fuel Cost" is calculated by multiplying "Total Gallons" by
"Avg Price." *See id.* The "Business Use" is calculated by taking the "Deliveries"
miles and dividing them by the "Total Miles Driven." *See id.*

([Filing No. 80 at 5](#).)  As the calculation shows, the alleged deficiency cited by Jack's regarding

"time logs" is irrelevant (and not considered) in calculating Tyler's vehicle cost per miles.

Additionally, Tyler notes that the reference to "time logs" in the report was poorly referenced in

the report.  ([Filing No. 80 at 6](#).)[6]  Ellis sufficiently explains his methodology, based on a

preponderance of the evidence, used in calculating Tyler's vehicle cost per mile of making

deliveries from the Pendleton Pike and Castleton stores.  Moreover, the Court may not decide if

the expert's opinion is correct; rather, it must only determine whether the expert's testimony is

pertinent to an issue in the case.  *Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir. 2000).

Here, Ellis is a qualified expert in tax and accounting services, and his testimony regarding his

calculation of vehicle expense per mile will assist the jury in determining whether or not Jack's

reimbursement rate reasonably accounted for Tyler's actual vehicle costs per mile in reimbursing

Tyler for Driver's Fees.

## C.   <u>Unpaid Wages</u>

As noted previously, Tyler contends that he was not paid for all of his hours worked at the

Pendleton Pike store.  Specifically, Tyler alleges that his clock-out times for closing the store are

inaccurate.  In moving for summary judgment, Jack's contends that Tyler does not have any

evidence that he performed work for which he was not paid.

"[A]n employee who brings suit pursuant to FLSA 'has the burden of proving that he

performed work for which he was not properly compensated'".  *Melton v. Tippecanoe Cty.,* 838

---

[6] The reference occurs in a footnote of the vehicle cost calculation.  ([Filing No. 70-2 at 34](#).)

F.3d 814, 818 (7th Cir. 2016) (citation omitted). Quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1943), the Seventh Circuit explained,

> [w]here the employee alleges that his employer kept inaccurate records, he 'has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'

*Melton*, 838 F.3d at 818. After the employee makes such a showing, the burden then shifts to the employer to produce evidence of the precise amount of work performed or with evidence to negate the reasonable inference drawn from the employee's evidence. *Id.*

It is undisputed that Tyler did not keep actual records of his clock-out times. (Filing No. 80 at 9.) Tyler relies on his testimony that he would close almost every shift that he worked and that closing duties would take roughly one hour to complete. The Pendleton Pike store closed at 11:00 p.m., therefore Tyler argues that the clock-out times "are replete with clock-out times that are not within the range in which Mr. Tyler testified." *Id.* Citing *Brown v. Family Dollar Stores of Indiana, L.P.,* 534 F.3d 593 (7th Cir. 2008), Tyler contends that given the closing time of the store and that he was the closing delivery driver (with closing duties)—that this evidence is enough to infer that his clock-out times (and Jack's timekeeping records) are inaccurate. (Filing No. 80 at 10; Filing No. 71 at 15.)

In *Brown*, the plaintiff alleged that she was not paid for overtime work. Although, she could not identify with specificity the hours or days for which she worked uncompensated overtime, she introduced evidence, including personal observations, that management subsequently altered her time records (and that of others) prior to the issuance of paychecks. *Brown,* 534 F.3d at 595. Moreover, while employed, the plaintiff pointed out to management that other employees' checks were short, and was given the response that they would not be paid. The Seventh Circuit explicitly held that this evidence was sufficient to raise a genuine issue of fact

regarding the accuracy of the records kept by the employer. *Id.* at 596. The similarity that Tyler attempts to draw with the *Brown* case, concerns the additional evidence that the plaintiff in *Brown* submitted that her employer's time records could not have been accurate given the time it would have taken her to perform closing duties. *Id*. However, *Brown* is distinguishable on its facts. The plaintiff in *Brown* testified that she was the only person with managerial duties who could open and close the store, yet not only did the employer's time records not account for the time it took to close the store, but the records also had her clocking out before the store would have even closed. Given that the plaintiff was the only one who could close the store, the fact that the employer's time records had her clocking out before the store closed cast doubt on the accuracy and adequacy of the employer's time records under the Fair Labor Standards Act ("FLSA"), and thus the Seventh Circuit held under the just and reasonable inference standard that the records were inaccurate. *Id.* at 596.

Jack's persuasively argues that Tyler's unpaid wage claim is flatly refuted by the evidence. (Filing No. 74 at 9.) The present case is distinguishable from *Brown* on a number of grounds. Although Tyler alleges that he performed closing duties, he was not tasked with being the only person that could close the store. In this case, it is undisputed that Johnson was the store closing manager for the closing shifts in which Tyler alleges he was not paid for all of his hours. (Filing No. 64-1 at 35.) During Tyler's deposition, Jack's counsel went over a series of identical clock-out times by date for Tyler and Johnson, and Tyler testified that the times were identical and that he had no reason to believe Johnson would inaccurately report his own time. (*See* Filing No. 64-1 at 78-93.) Jack's argues (and Tyler does not dispute) that for the twenty-three shifts cited by Tyler, the time sheets show Johnson clocking out at the same time. (Filing No. 74 at 16.) Moreover, Tyler also testified that there were slow times that he would start closing duties before

the store officially closed.  ([Filing No. 64-1 at 42](#).)  Jack's contends that this testimony evidences

that Tyler did not necessarily have to be at the store for an hour after the store closed, *i.e.,* midnight,

because Tyler admitted that he sometimes performed the same closing tasks prior to 11:00 p.m.

([Filing No. 74 at 15](#).)  Tyler's Castleton store clock-out times, which Tyler admits are accurate,

reveal similar clock-out times.  ([Filing No. 64-4](#); [Filing No. 64-5](#).)  The Castleton store also closed

at 11:00 p.m. on weekdays and Tyler had the same position and job duties.  This is not a case, such

as *Brown*, where the employer's timekeeping records were lacking in several respects, in addition

to the plaintiff in that case personally observing her employer's alteration of timekeeping records.

The Court agrees with Jack's that Tyler's unpaid wages claim is flatly refuted by the hard

evidence.  Tyler fails to create a just and reasonable inference that he was not paid all of his hours

in closing the Pendleton Pike store or that Jack's timekeeping records are inaccurate.  Thus, the

burden does not shift to Jack's as Tyler has failed to clear the initial hurdle.  *Turner v. The Saloon,*

*Ltd.,* considered facts in which the employer submitted evidence of co-workers that worked the

same shift to prove its timekeeping records were accurate as to the plaintiff employee.  595 F.3d

679 (7th Cir. 2010) (holding plaintiff's mere assertions that employer's records were inaccurate

insufficient to create a jury issue nor raise a just and reasonable inference that the plaintiff was not

paid all wages).  In any event, largely pointing to Tyler's own testimony, Jack's has negated the

inference raised by Tyler that the clock-out times recorded on his timesheet do not (and could not)

reflect the time necessary for his closing duties.  Accordingly, summary judgment is **granted** in

favor of Jack's on Tyler's unpaid wages claim.

### D.      Failure to Pay Minimum Wage

Jack's also moves for summary judgment on Tyler's failure to pay at least the minimum

wage claim.  ([Filing No. 74 at 17](#).)  Tyler contends that due to vehicle expenses (thereby reducing

his base hourly rate), his rate of pay failed to meet the minimum wage.  (Filing No. 71 at 16.) Minimum wages must be paid "free and clear" of job-related expenses.  29 C.F.R. § 531.35.

The DOL has promulgated regulations addressing how employers should reimburse certain business-related expenses that an employer requires solely for the convenience of the employer. 29 C.F.R. § 778.217(a).  "Such payment is not compensation for services rendered by the employees during any hours worked in the workweek."  *Id.*  The regulations provide that vehicle expenses, measured by actual or reasonably approximate amounts expended by employee, while traveling on the employer's business, will not be regarded as part of the employee's regular rate. 29 C.F.R. § 778.217(b).  "In some cases it is necessary to determine the costs involved when employees use their cars on their employer's business in order to determine minimum wage compliance."  U.S. DEP'T OF LABOR, FIELD OPERATIONS HANDBOOK, § 30C15 (NOV. 17, 2016). ("For example, car expenses are frequently an issue for delivery drivers employed by pizza or other carry-out type restaurants.")  The Handbook also provides that "the IRS *standard business mileage rate* found in IRS Publication 917, "Business Use of a Car" may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes."  *Id.* (emphasis in original) (noting that IRS standard business mileage rate represents depreciation, maintenance and repairs, gasoline (including taxes), oil, insurance, and vehicle registration fees).  "When minimum wage law requires an employer to reimburse an employee for using the employee's vehicle for the employer's benefit, the employer should reimburse the employee at the IRS per mile rate or keep detailed records of the employees' expenses to justify another reimbursement rate."  *Zellagui v. MCD Pizza, Inc.,* 59 F. Supp. 3d 712, 716 (E.D. Pa. 2014) (citing Department of Labor Field Operations Handbook, § 30c15(a) (issued June 30, 2000).

Tyler contends that Jack's Driver's Fees does not comply with 29 C.F.R. § 778.217 because the calculation that Jack's employs ($1.25 per delivery plus 3% of the order total pre-tax) to reimburse drivers does not take any vehicle expenses (such as gas prices and usage, car insurance, or miles driven) into account (Filing No. 71 at 17-18) ("Only by chance could Jack's driver's fee ever be a reasonable approximation of Mr. Tyler's vehicle expenses. . .").  Tyler requests that this Court find as a matter of law that Jack's Driver's Fees violate 29 C.F.R. § 778.217.  (Filing No. 80 at 13.)  The Court is not inclined to do so.  There are three reimbursement mileage rates at issue in this case: 1) the rate paid by Jack's; 2) the rate provided by Tyler's expert; and 3) the Internal Revenue Services' ("IRS") standard business mileage rate.  Because the mileage rate is the subject of both parties' cross-motions, at this juncture, the Court construes each party's proposed rate in a light favorable to the non-moving party on each motion.  "Plaintiffs' own expert offers an alternative rate that Plaintiffs contend is a reasonable, albeit conservative, approximation of their expenses for minimum wage purposes.  Therefore, the Court. . . will leave to the jury the determination of whether Defendants' reimbursement rate reasonably approximated Plaintiffs' vehicle expenses." *Perrin v. Papa John's Int'l, Inc.,* 114 F. Supp. 3d 707, 722 (E.D. Mo. 2015) (considering and denying summary judgment on three alternative proposed reimbursement rates).

Jack's contends that its Driver's Fees, derived from the previously noted calculation, are a reasonable approximation of Tyler's expenses.  (Filing No. 63 at 16.)  Although the calculation does not take into account miles driven, rather it is based on the customer's order total, Jack's explains that the miles driven can be derived from analyzing customer address data from the POS system.  Nevertheless, this calculation appears appropriate in determining what Jack's actually paid on a reimbursed cost per mile basis ($.037 for the Pendleton Pike store) taking Tyler's total miles driven in hindsight.  However, it does not resolve if this was a reasonable approximation of

Tyler's overall vehicle expenses as a delivery driver, particularly with regards to the question of whether Tyler's wages fell below the minimum wage for any given week. As noted previously, Tyler's expert calculated a reasonable rate of actual expenses at $.0419 for the Pendleton Pike store, and the IRS standard business mileage rate for the relevant time period was $.0565 in 2013 and $.056 per mile in 2014. INTERNAL REVENUE SERVICE, 2013 STANDARD MILEAGE RATES UP 1 CENT PER MILE FOR BUSINESS, MEDICAL AND MOVING, (NOV. 2, 2012), https://www.irs.gov/newsroom/2013-standard-mileage-rates-up-1-cent-per-mile-for-business-medical-and-moving; INTERNAL REVENUE SERVICE, 2014 STANDARD MILEAGE RATES FOR BUSINESS, MEDICAL AND MOVING ANNOUNCED (DEC. 6, 2013), https://www.irs.gov/newsroom/2014-standard-mileage-rates-for-business-medical-and-moving-announced.

In *Zellagui*, the district court held, as a matter of law, that because the employer failed to keep contemporaneous records of its pizza delivery drivers' actual vehicle expenses that the drivers were entitled to be reimbursed at the IRS rate. 59 F. Supp. 3d at 716. ("As a result, the Court finds that the IRS rate is a reasonable approximation of the actual per mile vehicle expenses incurred by Plaintiff and the Class members.") As noted previously, *Perrin*, a case with a similar procedural posture of cross-motions on summary judgment, left to the jury whether or not the employer's reimbursement rate reasonably approximated the plaintiff's vehicle expenses. *Perrin* did not "explicitly disagree" with the FLSA regulations and the DOL Handbook mandate that if employers do not track and reimburse actual expenses, they must reimburse employees at the IRS standard business rate, as Jack's contends. (Filing No. 74 at 19.) Rather, consistent with the DOL Handbook's mandate, the court took care to note that the IRS rate is not the *only* reasonable approximation of vehicle expenses, and explicitly noted that the IRS standard business mileage

rate *may* be a reasonable approximation in leaving the question to the jury. *Perrin*, 114 F.Supp.3d at 721-22). It is important to note that *Perrin* quoted the very DOL Handbook mandate at issue in this case including the language that the IRS standard business rate may be used in lieu of actual expenses and associated recordkeeping. *Id.* at 721. Although from different district courts, *Zellagui* and *Perrin* are both consistent with regards to analyzing the DOL Handbook's mandate regarding vehicle reimbursement expenses.

Here, neither party has designated evidence of Tyler's actual driving expenses in support of the alternate proposed rates. Jack's faults Tyler for not submitting such evidence; however, the DOL mandate provides that the IRS standard business rate may be used in lieu of actual costs and associated recordkeeping, a duty arguably imposed on the employer. *Zellagui's* facts dealt with an employer that did not keep records of drivers' actual expenses, thus finding no alternative rate at which the employer reimbursed actual expenses, the court found the IRS standard business rate a reasonable approximation. *Zellagui*, 59 F. Supp. 3d at 716. ("Because Domino's failed to keep detailed contemporaneous records of its delivery drivers' actual expenses, Plaintiff and the Class members are entitled to be reimbursed at the IRS rate."). Jack's also misapprehends *Zellagui* in asserting that the case failed to cite or mention the applicable FLSA regulations. (Filing No. 74 at 19.) While *Zellagui* does not explicitly cite the FLSA regulations, the case clearly concerns and refers to a minimum wage violation under FLSA.

> Employers are required to reimburse hourly-paid employees who drive for work to cover the vehicle-related expenses they incur so their hourly wages do not fall below the minimum when those expenses are taken into account. *See, e.g., Perrin v. Papa John's Int'l, Inc.,* 818 F.Supp.2d 1146 (E.D.Mo.2011) (denying motion to dismiss delivery drivers' FLSA and state law under-reimbursement claims)

*Zellagui v. MCD Pizza, Inc.,* 59 F. Supp. 3d 712, 715 (E.D. Pa. 2014) (analyzing and discussing the difference between the actual driver's expense mileage rate and the IRS standard business

mileage rate). The fact that the case explicitly focused on the rate to be used, under the DOL Handbook, to reasonably reimburse the tipped delivery drivers where such tips failed to account for their vehicle expenses, *i.e.,* violation of minimum wage requirements, is a technicality that does not warrant discrediting of the case as Jack's suggests. Because the rate to be used is a material factual dispute, the Court finds the approach taken in *Perrin* more appropriate, and leaves this issue to the jury. As noted previously, there are three possible mileage rates for a trier of fact to weigh and determine which provides a more reasonable approximation of Tyler's vehicle expenses. Regarding Tyler's contention that a material fact exists as to the total number of delivery miles at the Pendleton Pike store, the Court finds a seventy-mile difference from Tyler and Jack's proposed mileage numbers is not material, and summary judgment is not denied on this basis. Accordingly, summary judgment is **denied** as to Jack's, and it is **denied** as to Tyler as well on his claim for failure to pay minimum wage.

### E.     Indiana Wage Claims Act

Tyler moves for summary judgment on his Indiana Wage Claims Act ("IWCA") count contending that Jack's is statutorily liable for illegal deductions taken from his wages during his employment. (Filing No. 71 at 9.) Specifically, Jack's deducted $60.00 from Tyler's wages for accepting a counterfeit $100 dollar bill. The statue provides that an employee wage assignment to his or her employer is valid only if all of the following conditions are satisfied:

> (1) The assignment is:
>     (A) in writing;
>     (B) signed by the employee personally;
>     (C) by its terms revocable at any time by the employee upon written notice to the employer; and
>     (D) agreed to in writing by the employer.
>
> (2) An executed copy of the assignment is delivered to the employer within ten (10) days after its execution.
>
> (3) The assignment is made for a purpose described in subsection (b).

I.C. § 22-2-6-2(a).  Tyler did not sign a document agreeing to the deduction of money from his wages for accepting the counterfeit $100 dollar bill.  ([Filing No. 70-1 at 1](#).)  Jack's has not disputed that it violated the IWCA, but requests that it be allowed to preserve and not waive a good faith defense regarding Tyler's requested entitlement to 200% in liquidated damages.  ([Filing No. 74 at 22](#).) ("To the extent the Court finds that Plaintiff can establish a *prima facie* case as to his wrongful deduction claim or unpaid wage claim, Jack's preserves and does not waive its good faith defense.")  As such, the $60.00 owed to Tyler is not disputed, and summary judgment is **granted**.  Moreover, regarding liquidated damages, the IWCA provides:

> Every such person, firm, corporation, limited liability company, or association who shall fail to make payment of wages to any such employee as provided in section 1 of this chapter shall be liable to the employee for the amount of unpaid wages, and the amount may be recovered in any court having jurisdiction of a suit to recover the amount due to the employee. The court shall order as costs in the case a reasonable fee for the plaintiff's attorney and court costs. In addition, if the court in any such suit determines that the person, firm, corporation, limited liability company, or association that failed to pay the employee as provided in section 1 of this chapter was not acting in good faith, the court shall order, as liquidated damages for the failure to pay wages, that the employee be paid an amount equal to two (2) times the amount of wages due the employee.

I.C. § 22-2-5-2.  Citing *Naugle v. Beech Grove City Schools*, Tyler contends that liquidated damages are mandatory once a violation is established.  864 N.E.2d 1058, 1065-66 (Ind. Ct. App. 2007).  Jack's correctly notes that a good faith exception was added to the statute in 2015, and the Indiana Court of Appeals has held that there is no bar to the exception applying retroactively.  *See Brown v. Bucher & Christian Consulting, Inc.,* 87 N.E.3d 22, 26-27 (Ind. Ct. App. 2017).  Although Jack's cites the correct (updated) version of the law regarding the good faith defense, Jack's does not provide its good faith defense leaving that for another day.  ([Filing No. 74 at 23](#).) ("Thus, Jack's preserves and does not waive the good faith defense in the event of a finding of liability for Plaintiff's claims under the Indiana Wage Claims Act.")  The Court agrees with Tyler

that Jack's had a duty to put on evidence, at this stage, of its alleged good faith defense as the party opposing summary judgment. (Filing No. 80 at 15.) Thus, the Court has no choice but to find that Jack's did not act in good faith in violating the IWCA when Jack's illegally deducted $60.00 from Tyler's wages. *See Thacker v. Halter Vegetation Mgmt., Inc.,* No. 2:13-CV-00378-JMS, 2015 WL 417713, at *4 (S.D. Ind. Jan. 30, 2015) (awarding double liquidated damages where defendant conceded to violating IWCA statue by illegally deducting wages). Accordingly, Tyler is also entitled to $120.00 liquidated damages on this count.

## IV. <u>CONCLUSION</u>

As discussed above, the Court **GRANTS in part** and **DENIES in part** Jack's Motion for Partial Summary Judgment (Filing No. 62), and **GRANTS in part** and **DENIES in part** Tyler's Cross-Motion for Partial Summary Judgment (Filing No. 70). Both motions are **DENIED** as to Count II, Failure to Pay Minimum Wage. Jack's Motion is **GRANTED** as to Failure to Pay All Hours Worked. Tyler's Motion is **GRANTED** as to Illegal Deduction in violation of IWCA. Tyler is entitled to the $60.00 that was illegally deducted from his wages, and $120.00 in liquidated damages. No partial judgment shall issue. This matter will proceed to trial on the Failure to Pay Minimum Wage claim.

**SO ORDERED.**

Date: 9/20/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ronald E. Weldy
WELDY LAW
rweldy@weldylegal.com

Tiffany Lynn Gooden
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
tiffany.gooden@ogletree.com

Todd J. Kaiser
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
todd.kaiser@odnss.com

Hannah Lee Meils
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
hannah.meils@ogletreedeakins.com